Filed 7/9/26  P. v. Ascencio CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>ROBERT ASCENCIO,<br><br>    Defendant and Respondent. | H052858<br>(Santa Clara County<br>Super. Ct. No. C2208925) |

The Santa Clara County District Attorney charged Robert Ascencio and Juvenal Arellano with murder and robbery.  After a magistrate held both defendants to answer for murder, the superior court granted Ascencio's motion to dismiss the information under Penal Code section 995.[1]  On the district attorney's appeal, drawing all inferences in favor of the information, we find sufficient cause in the preliminary hearing evidence to support the theory that Ascencio was liable for felony murder because he was a major participant in the qualifying felonies of robbery and burglary and acted with reckless indifference to human life.  (See § 189, subd. (e)(3), *People v. Banks* (2015) 61 Cal.4th 788, 803 (*Banks*) [discussing elements of major participation]; *People v. Clark* (2016)

---

[1] Undesignated statutory references are to the Penal Code.

63 Cal.4th 522, 618–622 (*Clark*) [setting forth factors for reckless indifference].) We will accordingly reverse the superior court's order of dismissal.[2]

## I.   BACKGROUND

The district attorney charged Ascencio and Arellano by complaint with murder (§ 187, subd. (a); count 1) and first degree robbery (§ 211; count 2), alleging with respect to count 1 that Arellano personally and intentionally discharged a firearm resulting in the death of the victim, Khanh Kieu. (§ 12022.53, subd. (d).) Both defendants proceeded to a preliminary hearing.[3]

### A.   *Preliminary Hearing Evidence*

San Jose police responded to Kieu's residence on a report of a possible shooting. They found the front door closed and Kieu in the entryway with a gunshot wound to his torso. Kieu was neither conscious nor breathing and died at the scene. A broken lanyard, car keys, and a grocery store receipt from earlier that day were found in the living room near Kieu.

Video surveillance footage compiled from nearby residences and the grocery store showed a black Lexus driving by Kieu's house about one hour before the murder, when Kieu was not yet home. Two minutes after Kieu arrived at home, the same Lexus returned, made a U-turn at the end of the street, and parked behind Kieu's car. Three men emerged—the driver (Arellano) and passengers Ascencio and Holland[4]—all three clad in black with masks over their faces. Arellano, briefly seen holding a shiny object in

---

[2] The People are not seeking reinstatement of the firearm enhancement alleged against Ascencio under section 12022, subdivision (d).

[3] A third co-participant, Arthur Brian Holland, fled after Ascencio was arrested, and he remains at large.

[4] Ascencio does not dispute identity for purposes of this appeal.

his hand as he left the Lexus, led the approach to the front of the home, moving out of the video frame as he says, "[O]pen the fucking door."

The footage next captured the successive sounds of a firearm slide being pulled back, a gunshot, and a voice screaming and crying. Ascencio and Holland, still visible in the video when the off-camera gun was racked and fired, then accelerated toward the house and off camera, but one of them briefly paused at the sound of the gunshot. All three men remained out of camera view for less than a minute, then emerged from Kieu's property: A dark item hung from one of Arellano's hands as he and the others entered the Lexus, and the three drove away.

T.T., 68 years old and hard of hearing, was renting a room at Kieu's house at the time. While in the kitchen, she heard a "loud" front door opening and looked over to see Kieu with three unidentified black-clad, masked men. T.T. noted that Kieu was "first, yelling and screaming," and then, crying. Two of the intruders "aggressively" grabbed Kieu by the shoulders as he leaned back. T.T. attempted to run upstairs, but the third intruder grabbed her arm and tried to "yank her down." T.T. pleaded with him in Vietnamese, telling him she only rented a room there and to please let her go. The person appeared to " 'react[] to what [T.T.] was saying' " and eventually released her. After T.T. retreated upstairs, she noticed at some point that everything got very quiet.

Cell service records for phone numbers associated with Arellano, Ascencio, and Holland documented many calls and text messages between the three numbers the day before and the morning of the homicide. A three-way call between the three numbers the day before the homicide lasted about 30 minutes. The phone numbers associated with Arellano and Ascencio were connected to a cell tower a half-mile from Kieu's home at the time of the homicide. Contact between the three numbers ceased within hours of Kieu's death.

Ascencio had dated T.N. in the month leading up to Kieu's murder. During their relationship, Ascencio twice asked T.N. for money. T.N. told Ascencio that Kieu's wife,

3

K.K., had offered her $200,000 in cash to buy T.N.'s house. Cell phone records showed that Ascencio and T.N. started communicating less than a month before Kieu was killed, had contact 240 times, and ceased contact less than a month after Kieu's death.

K.K. denied offering to buy T.N.'s house. K.K. said that after Kieu's death, she noticed that his backpack and other personal items (wallet, ring) were missing.

## B. *Holding Order and Subsequent Motion to Dismiss*

The magistrate found probable cause to hold Arellano and Ascencio to answer for murder (count 1) but not robbery (count 2) or the lesser included offense of attempted robbery. As to the robbery, the magistrate reasoned that neither T.N. nor K.K. were credible, given inconsistencies in their statements. The magistrate declined to hold Arellano to answer for the alleged enhancement for personal discharge of a firearm.

The district attorney filed an information charging Ascencio and Arellano with murder. The information included the allegation that Arellano used and personally discharged a firearm resulting in death (§§ 12022.5, subd. (a); 12022.53, subd. (d)), and that Ascencio knew Arellano was armed with a firearm (§ 12022, subd. (d)).

Ascencio moved to dismiss the information under section 995, arguing that the People failed to present evidence of express malice and were barred from proceeding under a felony murder theory by the magistrate's finding of no probable cause for the underlying robbery or attempted robbery. As to implied malice, Ascencio argued that the People did not show that Ascencio knew of, or intended to aid, Arellano's shooting of Kieu, or that he personally acted with conscious disregard for human life. The trial court granted Ascencio's motion and dismissed the information as to him.[5]

The district attorney timely appealed.

---

[5] The People represent on appeal that the court denied Arellano's motion to dismiss both the charge and firearm enhancements.

4

## II. DISCUSSION

When reviewing a trial court's ruling on a section 995 motion, we "disregard the ruling of the trial court and directly review the magistrate's ruling." (*People v. Superior Court (Mendez)* (2022) 86 Cal.App.5th 268, 277 (*Mendez*).) We independently review the magistrate's legal conclusions, " 'draw[ing] all reasonable inferences in favor of the information.' " (*Ibid*.) The magistrate's role " 'is to determine whether there is "sufficient cause" to believe [the] defendant guilty of the charged offense.' " (*Id.* at p. 276.) "[T]he showing required at a preliminary hearing is exceedingly low." (*Salazar v. Superior Court* (2000) 83 Cal.App.4th 840, 846.) "[A] magistrate … must be convinced of only such a state of facts as would lead a [person] of ordinary caution or prudence to believe, and conscientiously entertain a strong suspicion of the guilt of the accused." (*People v. Uhlemann* (1973) 9 Cal.3d 662, 667 (*Uhlemann)*.) This standard "signifies a level of proof below that of proof beyond a reasonable doubt, or even proof by a preponderance of the evidence." (*People v. Hurtado* (2002) 28 Cal.4th 1179, 1189.) " ' "We will not set aside an information 'if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it.' " ' " (*Mendez*, at p. 277.)

Here, the People contend that because they presented sufficient evidence of Ascencio's liability for murder under multiple theories, the trial court's order granting his motion to dismiss must be reversed. We agree that the People presented sufficient evidence to support liability under a felony murder theory and accordingly reverse the trial court's order.[6]

---

[6] We express no opinion on the People's alternative theory that sufficient evidence supports the theory that Ascencio directly aided and abetted implied malice murder.

5

## A.     *Effect of the Magistrate's Order and Reasoning*

The superior court in dismissing the information reasoned in part that it was bound by what it considered the magistrate's "factual findings" foreclosing the prosecution's reliance on a theory of felony murder predicated on robbery or attempted robbery as the qualifying felony.  Ascencio does not rely on this theory to defend against the People's appeal, and his forbearance here is well taken.  (See *Pizano v. Superior Court* (1978) 21 Cal.3d 128, 133 (*Pizano*) [distinguishing magistrate's legal conclusion as to the sufficiency of the evidence from a factual finding fatal to the prosecution theory]; *People v. Brice* (1982) 130 Cal.App.3d 201, 210 (*Brice*).)

True, the magistrate here declined to hold the defendants to answer for robbery or attempted robbery.  The magistrate explained that "[t]he evidence just doesn't look like a robbery to" her, rejecting K.K.'s testimony that her husband "never went anywhere without the [now-missing] backpack" on the ground that "he was clearly seen in the store paying for his groceries without the backpack and without a wallet."  But the magistrate stopped short of finding—as a factual matter—that the perpetrators took (or attempted to take) nothing from the home or from Kieu.[7]  Instead, the magistrate spoke of the legal deficiency in what the People's evidence showed—whether the evidence "look[ed] like a robbery to [her]."  The magistrate considered the evidence legally insufficient to establish probable cause to believe that "personal property" was taken "from [Kieu's] person or immediate presence" as section 211 requires along with "means of force or fear."  We

---

[7] We assume without deciding that we are bound by the magistrate's statement that she "d[id] not find either [T.N.] or [K.K.] … credible.  [¶]  Their testimony was all over the place and inconsistent with what they told the police and … with what they testified to at various times in court."  So we will not rely on either witness's testimony in our evaluation of the evidence.  (See *Pizano*, *supra*, 21 Cal.3d at p. 133 [citing as an example of a fatal factual finding "when [a] magistrate expresses disbelief of a witness whose testimony is essential to the establishment of some element of the corpus delicti"].)

6

infer from the same comments that the magistrate would likewise have considered the evidence legally insufficient to establish an intent to commit larceny in entering Kieu's home, under one available theory of residential burglary.

But because the magistrate's opinion of the legal sufficiency of the evidence is not controlling (see, e.g., *Pizano*, *supra*, 21 Cal.3d at p. 133; *Brice*, *supra*, 130 Cal.App.3d at p. 210; *Zemek v. Superior Court* (2020) 44 Cal.App.5th 535, 545–546), we find nothing in the magistrate's explanation of her rulings that would foreclose the People's reliance on a felony murder theory predicated on the actual or attempted perpetration of a robbery.

## B. *Evidence of Felony Murder*

### 1. *Qualifying Felony*

Under section 189, subdivision (e), "[a] participant in the perpetration or attempted perpetration of a [qualifying felony] in which a death occurs is liable for [first degree] murder only if," among other alternatives not asserted here, "[t]he person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e)(3).)[8] The evidence here is sufficient to support the murder charge on the theory that Kieu was killed while Arellano, Ascencio, and Holland were perpetrating or attempting to perpetrate a robbery or burglary (both qualifying felonies under section 189, subdivision (a)).

---

[8] After oral argument in this case, the Supreme Court "addresse[d] a discrete legal issue surrounding section 189, subdivision (e)(2)" (*People v. Morris* (2026) 19 Cal.5th 671, 681, fn. 3.) The high court in *Morris* held that to be liable for felony murder as a direct aider and abettor, a nonkiller must not only share the perpetrator's intent to kill but must also "aid or abet the actual killer in the lethal act, and not just the underlying felony." (*Id.* at p. 685; cf. *People v. Reyes* (2023) 14 Cal.5th 981, 991 [implied malice murder liability as a direct aider and abettor requires "aiding the commission of the [perpetrator's] life-endangering act"].) But because *Morris* did not address the major-participant theory of felony murder independently available under section 189, subdivision (e)(3), it does not bear on our analysis. (*Morris*, at p. 681, fn. 3.)

The evidence from the preliminary hearing tended to show that Arellano, Ascencio, and Holland went to Kieu's neighborhood about an hour before the homicide and circled the area, permitting a reasonable inference that they were awaiting their intended target. All three men wore nondescript black clothing and face masks, further supporting an inference that they intended to conceal their identities from persons they anticipated encountering at the home. Within minutes of Kieu's return, Arellano rushed from the car toward Kieu's front door, Ascencio and Holland close behind, and before firing ordered Kieu to open the door: All this suggested an intent to forcibly enter. T.T., the tenant, testified that all three defendants entered the home and that two of the men "aggressively" grabbed and restrained the mortally wounded Kieu, while the third prevented the tenant from fleeing. The video evidence also supports a strong suspicion that Arellano, though holding only a gun when he left the car to accost Kieu, returned to the car with what looks like a backpack. Viewed in the light most favorable to the information, the totality of this evidence is sufficient to support a strong suspicion that Ascencio accompanied Arellano and Holland to Kieu's home intending to enter his home for larcenous purpose—whether to rob him or to assault him for some other coercive purpose.[9]

Ascencio does not dispute for purposes of this appeal that the three defendants were acting in concert according to plan, but urges us to agree with the superior court that "[t]he record is silent as to what the plan was." He relies on the property that defendants left behind—$500 still in Kieu's vest pocket and Kieu's car keys—to dispute any intent to rob or commit larceny. But like the magistrate and the superior court, Ascencio did

_____

[9] Even if Ascencio entered Kieu's residence with the sole intent to commit felony assault and not larceny, nothing in the law would preclude the People from predicating a felony murder charge on burglary under that theory. (See *People v. Farley* (2009) 46 Cal.4th 1053, 1118–1119 [noting that "[i]n enacting section 189, the Legislature did not … exclude burglaries based upon an intent to assault" and "nothing in the language of section 189 supports the application of the merger doctrine to its terms"].)

not in his briefing address video evidence appearing to show Arellano fleeing Kieu's home with what a reasonable viewer could infer was a backpack he did not have at the time of entry.[10]  That the assailants left some valuable property untouched does not defeat an inference that the defendants actually found and took other property from Kieu or entered the home with the intention to do so.

### 2.　*Section 189, subdivision (e)(3)*

Beyond the actual or attempted commission of a qualifying felony, felony murder liability requires the People to present sufficient evidence that Ascencio was "a major participant" in that underlying felony and acted with "reckless indifference to human life." (§ 189, subd. (e)(3).)  In *Clark,* the Supreme Court acknowledged the " 'significant[] overlap' " between these two requirements, explaining that " 'the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.' " (*Clark*, *supra*, 63 Cal.4th at p. 615.)  But these two elements still require individual consideration.  (See *id*. at p. 616.)

#### a.　*Major Participant*

In evaluating whether a defendant was a major participant, we consider the following factors:  (1) the defendant's role in planning the crime that led to the death; (2) the defendant's role in supplying or using deadly weapons; (3) the defendant's awareness of the particular dangers posed by the nature of the crime; (4) whether the defendant was present at the scene of the killing and in a position to facilitate or prevent it; (5) whether the defendant's own actions or inactions played a specific role in the

---

[10] Ascencio, responding at oral argument to our focus letter, surmised the poor resolution of the surveillance video obscured the possibility that Arellano had already been wearing a backpack—in the car while driving and later arming himself, and when exiting the car—that is visually imperceptible in the video.  Whatever the merits of this argument at trial, the availability of a nonincriminating explanation for the video evidence does not make the suspicion that evidence warrants less than strong.

death; and (6) the defendant's actions after lethal force was used. (See *Banks*, *supra*, 61 Cal.4th at p. 803.)

Here, evidence from the preliminary hearing supported a strong suspicion that Ascencio played an active role in planning the predicate felony resulting in Kieu's death. Cell phone data suggested a preexisting relationship between Ascencio and T.N. (irrespective of T.N.'s credibility as a witness) and between T.N. and K.K. Conversely, no evidence linked any other defendant to Kieu prior to the crime. This supports an inference that of the three participants, it was Ascencio who had identified Kieu as a potential target. Cell phone data also suggested significant advance coordination before the attack, with Arellano, Ascencio, and Holland conferring by phone multiple times, including a 30-minute three-way call. The calls' proximity in time to the home invasion—and their cessation shortly after—leaves it reasonable to infer that Arellano, Ascencio, Holland used the calls to discuss the logistics of the robbery at Kieu's home, including when to arrive, what to wear to conceal their identities, and how best to preserve the element of surprise and overcome Kieu's resistance. (*People v. Superior Court (Jurado)* (1992) 4 Cal.App.4th 1217, 1226 (*Jurado*) [" '[a]lthough there must be *some* showing as to the existence of each element of the charged crime [citation] such a showing may be made by means of circumstantial evidence supportive of reasonable inferences' "].) That the three men showed up on the day of the home invasion wearing similar clothes and face masks further supports and corroborates that each intended to take a visible role in the crime's commission.

Sufficient evidence supports a strong suspicion that Ascencio was aware of the dangers of a robbery and home invasion and yet took actions that played a role in Kieu's death. Surveillance footage showed all three men leaving the car for Kieu's residence in a swift, purposeful, and apparently coordinated movement, with Arellano in the lead and Ascencio and Holland following close behind. Arellano can be seen retrieving what a reasonable viewer could infer was a gun before he or his passengers leave the car.

10

Neither passenger retreated or even slowed their advance toward Kieu's home once Arellano drew his gun immediately upon exiting the car. Ascencio contends that the surveillance footage shows he did not see Arellano's gun or know Arellano would shoot Kieu. But a reasonable viewer of the same surveillance footage could conclude that (1) both passengers were still in the car while Arellano retrieved the gun and (2) both passengers quickened their pace toward the house on hearing Arellano rack the gun, suggesting that they understood gunplay was imminent and were not deterred but rather intent on joining the fray. And even *after* Arellano's gunshot through the door left Kieu screaming, Ascencio's own actions "after lethal force was used" support the inference of major participation, in that Ascencio entered the house and—rather than rendering aid to a mortally wounded Kieu—either "aggressively" restrained him or prevented his tenant from acting. (*Banks, supra*, 61 Cal.4th at p. 803.)

In short, Ascencio's conduct suffices to give rise to at least a "strong suspicion" that he was a major participant in the felony of home invasion robbery or burglary. (*Uhlemann, supra*, 9 Cal.3d at p. 667.)

### b. *Reckless Indifference*

In evaluating whether the prosecution presented sufficient evidence that Ascencio acted with reckless indifference to human life, we consider the following factors: (1) the defendant's knowledge of weapons, and use and number of weapons; (2) the defendant's physical presence at the scene of the killing and opportunity to restrain the crime and/or aid the victim; (3) the duration of the felony; (4) the defendant's knowledge that an accomplice was likely to kill; and (5) the defendant's attempts to minimize violence during the crime. (*Clark, supra*, 63 Cal.4th at pp. 618–622.) Reckless indifference to human life "requires subjective awareness of a higher degree of risk than the 'conscious disregard for human life' required for conviction of second degree murder based on implied malice." (*People v. Johnson* (2016) 243 Cal.App.4th 1247, 1285; see also

11

*People v. Underwood* (2024) 99 Cal.App.5th 303, 317.) We look to the totality of the circumstances to determine whether the defendant acted with reckless indifference to human life, and here conclude that he did. (See *In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*).)

Evidence from the preliminary hearing established that Ascencio was present at the scene, just steps behind the actual killer. (*People v. Garcia* (2020) 46 Cal.App.5th 123, 148 [defendant's "[p]resence at the scene of the murder is a particularly important aspect of the reckless indifference inquiry"]; cf. *Scoggins*, *supra*, 9 Cal.5th at p. 678 [no reckless indifference in part because defendant was not physically present].) He and the others lay in wait for Kieu, circling the neighborhood until Kieu's return. (Cf. *Clark*, *supra*, 63 Cal.4th at pp. 621–622 [insufficient evidence of reckless indifference when defendant planned to rob store after it closed and most employees had departed].) Neither passenger was deterred when Arellano appeared to arm himself with the gun, instead joining Arellano by leaving the car and following him toward the house. When Arellano fired the ultimately fatal first shot, Ascencio unequivocally became aware that Arellano "was likely to engage in lethal violence," but did not take steps to withdraw from the situation. (*Id.* at p. 621.) Instead, he and Holland continued to facilitate the robbery by forcing their way into Kieu's house, helping Arellano restrain Kieu, and neutralizing the tenant. Thus, although Ascencio did not personally use a weapon, he did nothing to minimize violence during the home invasion and persisted even after the gunshot that left Kieu screaming. (*Clark*, at p. 619 [explaining that if a defendant " 'fails to act as a restraining influence,' " he " 'is arguably more at fault for the resulting murders' "].) The totality of this conduct provides "sufficient cause" to believe that Ascencio acted with reckless indifference to human life, even if he had not subjectively expected Arellano to shoot to kill. (*Mendez*, *supra*, 86 Cal.App.5th at p. 276.)

We are mindful of *People v. Emanuel* (2025) 17 Cal.5th 867 (*Emanuel*), where the Supreme Court concluded that substantial evidence did not support the trial court's

determination under section 1172.6, subdivision (d) that the defendant had acted with reckless indifference for human life. (*Emanuel*, at p. 875.) But *Emanuel* is distinguishable, both legally and factually.

As a legal matter, although the Supreme Court reviewed the trial court decision for substantial evidence, the high court's application of this otherwise deferential standard was necessarily informed by the exacting standard of proof beyond a reasonable doubt that the trial court had to apply. (*Emanuel*, *supra*, 17 Cal.5th at p. 885; cf. *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005 [explaining substantial evidence as applied to proof by clear and convincing evidence].) Here, as we have explained, our substantial evidence review is conversely informed by the more permissive standard of proof that applies at preliminary hearing: We review only whether the evidence supports the "strong suspicion" of reckless indifference to human life necessary to hold Ascencio to answer the murder charge at trial. (*Uhlemann*, *supra*, 9 Cal.3d at p. 667.)

As a factual matter, the high court in *Emanuel*, *supra*, 17 Cal.5th 867 found it significant that the defendant did not know his accomplice had a gun or that he planned to use it (*id.* at p. 885), and when the accomplice assaulted the victim with the gun, the defendant told his accomplice " 'let's go,' " and attempted to "walk[] away from the robbery." (*id.* at p. 891). Here, the video recording permits the contrary inference that Ascencio could see Arellano arm himself with the gun and yet followed Arellano to confront Kieu, continuing even after Arellano fired his gun and Kieu could be heard screaming. The court in *Emanuel* also observed that the prearranged meeting at which the robbery would take place was near a public park during daylight hours, a setting which at least circumstantially diminished an expectation for serious violence. (*Id.* at p. 887.) Here, however, the three assailants apparently waited to surprise Kieu at his home, confronting him there in what they could have expected was relative seclusion. Indeed, the Supreme Court in *Emanuel* anticipated this distinction, observing that in the context of "an armed home invasion robbery," a "trier of fact might reasonably conclude

that the objective risk of violence posed by the crime … is graver than the risk of violence inherent in any violent felony." (*Id*. at p. 889.)

To be sure, we do not suggest this evidence would satisfy the prosecution's trial burden of proof beyond a reasonable doubt. But viewing the evidence in the light most favorable to the information at this early stage, we cannot say that there is "a total absence of evidence" that Ascencio was a major participant in the robbery and burglary, or that he acted with reckless indifference to human life. (See *Jurado*, *supra*, 4 Cal.App.4th at p. 1226 [explaining that an information should be set aside "only when there is a total absence of evidence to support a necessary element of the offense charged"]; *People v. Superior Court (Valenzuela)* (2021) 73 Cal.App.5th 485, 503 [noting that at preliminary hearing, "[e]very legitimate inference that may be drawn from the evidence must be made in favor of the charges alleged in the information"].)

### III. DISPOSITION

The order of dismissal is reversed.

_____
LIE, J.

WE CONCUR:


_____
GROVER, Acting P. J.


_____
WILSON, J.


*People v. Ascencio*
H052858